AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Western District of Washington

FILED ———— LODGED
———— RECEIVED

**JUL 09 2015**

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY ————————————————— DEPUTY

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>5264 NE 121st Ave, Apartment 150<br>Vancouver, WA 98682 | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. MJ15-5111

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
The residence at 5264 NE 121st Ave, Apartment 150, Vancouver, WA 98682 as further described in Attachment A, which is attached hereto and incorporated herein by this reference.

located in the _____Western_____ District of _____Washington_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached hereto and incorporated herein by this reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. § 2252(a)(2) | (receipt and distribution of child pornography) |
| 18 U.S.C. § 2252(a)(4)(B) | (possession of child pornography) |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

**SAMUEL A. MAUTZ, SPECIAL AGENT, FBI**
*Printed name and title*

Sworn to before me ~~and signed in my presence.~~ pursuant to Rule 4.1.

Date: 7/9/2015

*Judge's signature*

City and state:  TACOMA, WASHINGTON

**DAVID W. CHRISTEL, U.S. MAGISTRATE JUDGE**
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

## INTRODUCTION

I, Samuel A. Mautz, having been first duly sworn, do hereby depose and state as follows:

1.      I have been employed as a Special Agent of the FBI since 2011, and am currently assigned to the Vancouver, Washington Resident Agency of the Seattle, Washington Division.  Previously I was assigned to the Pierre, South Dakota Resident Agency of the Minneapolis, Minnesota Division.  While employed by the FBI, I have investigated federal criminal violations related to high technology or cyber crime, child exploitation, and child pornography.  I have gained experience through training at the FBI Academy in Quantico, VA as well as training to be a Digital Extraction Technician for the FBI and everyday work relating to conducting these types of investigations.  While assigned to the Pierre, South Dakota Resident Agency, I conducted investigations in conjunction with the South Dakota Internet Crimes Against Children Task Force.  I have received training in the area of child pornography and child exploitation, and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media including computer media.  Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. §§ 2251 and 2252A, and I am authorized by the Attorney General to request a search warrant.

2015R00778
EXHIBIT A-002
MICHAUD_000174

2.      I have probable cause to believe that contraband and evidence of a crime, fruits of

a crime, and instrumentalities of violations of: 18 U.S.C. § 2252(a)(2) and (b)(1) (receipt

and distribution of, conspiracy to receive and distribute, and attempt to receive and

distribute child pornography); and 18 U.S.C. § 2252(a)(4)(B) and (b)(2) (possession of,

knowing access, conspiracy to access, or attempted access with intent to view child

pornography), are located within 5264 NE 121st Ave, Apartment 150, Vancouver, WA

98682 (hereinafter the "SUBJECT PREMISES"). I submit this application and affidavit

in support of a search warrant authorizing a search of the SUBJECT PREMISES, as

further described in Attachments A and B, incorporated herein by reference, which is

located in the Western District of Washington. Located within the SUBJECT

PREMISES to be searched, I seek to seize evidence, fruits, and instrumentalities of the

foregoing criminal violations. I request authority to search the entire SUBJECT

PREMISES, including the residential dwelling and any computer and computer media

located therein where the items specified in Attachment B may be found, and to seize all

items listed in Attachment B as contraband and instrumentalities, fruits, and evidence of

crime.

3.      The statements contained in this affidavit are based in part on:  information

provided by FBI Special Agents; written reports about this and other investigations that I

have received, directly or indirectly, from other law enforcement agents, information

gathered from the service of administrative subpoenas; the results of physical and

electronic surveillance conducted by law enforcement agents; independent investigation

2

1   and analysis by FBI agents/analysts and computer forensic professionals; and my

2   experience, training and background as a Special Agent (SA) with the FBI.  Because this

3   affidavit is being submitted for the limited purpose of securing authorization for the

4   requested search warrant, I have not included each and every fact known to me

5   concerning this investigation.  Instead, I have set forth only the facts that I believe are

6   necessary to establish the necessary foundation for the requested warrant.

7

8

9   4.       This affidavit in support of the search warrant is being presented electronically

10  because  I am located in Vancouver, Washington.

11

12                                   **DEFINITIONS**

13  5.       The following definitions apply to this Affidavit and attachments hereto:

14       a.   "Bulletin Board" means an Internet-based website that is either secured

15            (accessible with a password) or unsecured, and provides members with the

16            ability to view postings by other members and make postings themselves.

17

18            Postings can contain text messages, still images, video images, or web

19            addresses that direct other members to specific content the poster wishes.

20

21            Bulletin boards are also referred to as "internet forums" or "message boards."

22            A "post" or "posting" is a single message posted by a user.  Users of a bulletin

23            board may post messages in reply to a post.  A message "thread," often labeled

24            a "topic," refers to a linked series of posts and reply messages.  Message

25            threads or topics often contain a title, which is generally selected by the user

26            who posted the first message of the thread.  Bulletin boards often also provide

27

28

                                           3

EXHIBIT A-004
MICHAUD_000176

the ability for members to communicate on a one-to-one basis through "private messages." Private messages are similar to e-mail messages that are sent between two members of a bulletin board. They are accessible only by the user who sent/received such a message, or by the Website Administrator.

b. "Chat" refers to any kind of communication over the Internet that offers a real-time transmission of text messages from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

c. "Child Erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, legally obscene or that do not necessarily depict minors in sexually explicit conduct.

d. "Child Pornography," as used herein, is defined in 18 U.S.C. § 2256(8) as any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been

4

created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

e. "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1) as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

f. "Computer Server" or "Server," as used herein, is a computer that is attached to a dedicated network and serves many users. A web server, for example, is a computer which hosts the data associated with a website. That web server receives requests from a user and delivers information from the server to the user's computer via the Internet. A domain name system ("DNS") server, in essence, is a computer on the Internet that routes communications when a user types a domain name, such as www.cnn.com, into his or her web browser. Essentially, the domain name must be translated into an Internet Protocol ("IP") address so the computer hosting the web site may be located, and the DNS server provides this function.

g. "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to,

5

***PROTECTED***

central processing units, internal and peripheral storage devices such as fixed

disks, external hard drives, floppy disk drives and diskettes, and other memory

storage devices); peripheral input/output devices (including, but not limited to,

keyboards, printers, video display monitors, and related communications

devices such as cables and connections), as well as any devices, mechanisms,

or parts that can be used to restrict access to computer hardware (including, but

not limited to, physical keys and locks).

h.   "Computer software," as used herein, is digital information which can be

interpreted by a computer and any of its related components to direct the way

they work.  Computer software is stored in electronic, magnetic, or other

digital form.  It commonly includes programs to run operating systems,

applications, and utilities.

i.   "Computer-related documentation," as used herein, consists of written,

recorded, printed, or electronically stored material which explains or illustrates

how to configure or use computer hardware, computer software, or other

related items.

j.   "Computer passwords, pass-phrases and data security devices," as used herein,

consist of information or items designed to restrict access to or hide computer

software, documentation, or data.  Data security devices may consist of

hardware, software, or other programming code.  A password or pass-phrase (a

string of alpha-numeric characters) usually operates as a sort of digital key to

2015R00778
EXHIBIT A-007
MICHAUD_000179

"unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

k.   "File Transfer Protocol" ("FTP"), as used herein, is a standard network protocol used to transfer computer files from one host to another over a computer network, such as the Internet.  FTP is built on client-server architecture and uses separate control and data connections between the client and the server.

l.   "Host Name." A Host Name is a name assigned to a device connected to a computer network that is used to identify the device in various forms of electronic communication, such as communications over the Internet;

m.   "Hyperlink" refers to an item on a web page which, when selected, transfers the user directly to another location in a hypertext document or to some other web page.

n.   The "Internet" is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international

2015R00778
EXHIBIT A-008
MICHAUD_000180

***PROTECTED***

borders, even when the devices communicating with each other are in the same state.

o. "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line ("DSL") or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a modem, the subscriber can establish communication with an Internet Service Provider ("ISP") over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password.

p. "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer every time it accesses

8

EXHIBIT A-009
MICHAUD_000181

the Internet.  IP addresses might also be "static," if an ISP assigns a user's

computer a particular IP address which is used each time the computer

accesses the Internet.  IP addresses are also used by computer servers,

including web servers, to communicate with other computers.

q.  Media Access Control ("MAC") address.  The equipment that connects a

computer to a network is commonly referred to as a network adapter.  Most

network adapters have a MAC address assigned by the manufacturer of the

adapter that is designed to be a unique identifying number. A unique MAC

address allows for proper routing of communications on a network.  Because

the MAC address does not change and is intended to be unique, a MAC

address can allow law enforcement to identify whether communications sent or

received at different times are associated with the same adapter.

r.  "Minor" means any person under the age of eighteen years.  See 18 U.S.C. §

2256(1).

s.  The terms "records," "documents," and "materials," as used herein, include all

information recorded in any form, visual or aural, and by any means, whether

in handmade form (including, but not limited to, writings, drawings, painting),

photographic form (including, but not limited to, microfilm, microfiche, prints,

slides, negatives, videotapes, motion pictures, photocopies), mechanical form

(including, but not limited to, phonograph records, printing, typing) or

electrical, electronic or magnetic form (including, but not limited to, tape

9

2015R00778
EXHIBIT A-010
MICHAUD_000182

recordings, cassettes, compact discs, electronic or magnetic storage devices

such as floppy diskettes, hard disks, CD-ROMs, digital video disks ("DVDs"),

Personal Digital Assistants ("PDAs"), Multi Media Cards ("MMCs"), memory

sticks, optical disks, printer buffers, smart cards, memory calculators,

electronic dialers, or electronic notebooks, as well as digital data files and

printouts or readouts from any magnetic, electrical or electronic storage

device).

t.  "Secure Shell" ("SSH"), as used herein, is a security protocol for logging into a

remote server.  SSH provides an encrypted session for transferring files and

executing server programs.

u.  "Sexually explicit conduct" means actual or simulated (a) sexual intercourse,

including genital-genital, oral-genital, or oral-anal, whether between persons of

the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or

masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of

any person.  See 18 U.S.C. § 2256(2).

v.  "URL" is an abbreviation for Uniform Resource Locator and is another name

for a web address.   URLs are made of letters, numbers, and other symbols in a

standard form.   People use them on computers by clicking a pre-prepared link

or typing or copying and pasting one into a web browser to make the computer

fetch and show some specific resource (usually a web page) from another

computer (web server) on the Internet.

2015R00778

EXHIBIT A-011

MICHAUD_000183

w. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

x. "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language ("HTML") and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol ("HTTP");

## BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE

6.      Jay Michaud or a user of the Internet account at 5264 NE 121st Ave, Apartment 150, Vancouver, WA 98682 has been linked to an online community of individuals who regularly send and receive child pornography via a website that operated on an anonymous online network.   The website is described below and referred to herein as "Website A."[1]   There is probable cause to believe that Jay Michaud or a user of the Internet account at 5264 NE 121st Ave, Apartment 150, Vancouver, WA 98682 knowingly accessed with intent to view/receive/distribute child pornography on "Website A."

---

[1] The actual name of "Website A" is known to law enforcement. Disclosure of the name of the site would potentially alert its members to the fact that law enforcement action is being taken against the site and its users, potentially provoking members to notify other members of law enforcement action, flee, and/or destroy evidence. Accordingly, for purposes of the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms and the website will be identified as "Website A."

2015R00778
EXHIBIT A-012
MICHAUD_000184

The Network[2]

7.      "Website A" operated on a network ("the Network") available to Internet users

who are aware of its existence.  The Network is designed specifically to facilitate

anonymous communication over the Internet.  In order to access the Network, a user must

install computer software that is publicly available, either by downloading software to the

user's existing web browser, downloading free software available from the Network's

administrators, or downloading a publicly-available third-party application.[3]  Using the

Network prevents someone attempting to monitor an Internet connection from learning

what sites a user visits and prevents the sites the user visits from learning the user's

physical location.  Because of the way the Network routes communication through other

computers, traditional IP identification techniques are not viable.

8.      Websites that are accessible only to users within the Network can be set up within

the Network and "Website A" was one such website.  Accordingly, "Website A" could

not generally be accessed through the traditional Internet.[4]  Only a user who had installed

the appropriate software on the user's computer could access "Website A."  Even after

---

[2] The actual name of the Network is known to law enforcement.  The network remains active and disclosure of the name of the network would potentially alert its members to the fact that law enforcement action is being taken against the network, potentially provoking members to notify other members of law enforcement action, flee, and/or destroy evidence.  Accordingly, for purposes of the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms and the network will be identified as "the Network."

[3] Users may also access the Network through so-called "gateways" on the open Internet, however, use of those gateways does not provide users with the full anonymizing benefits of the Network.

[4] Due to a misconfiguration, prior to February 20, 2015, Website A was occasionally accessible through the traditional Internet.  In order to access Website A in that manner, however, a user would have had to know the exact IP address of the computer server that hosted Website A, which information was not publicly available.  As of on or about February 20, 2015, Website A was no longer accessible through the traditional Internet.

12

2015R00778
EXHIBIT A-013
MICHAUD_000185

connecting to the Network, however, a user had to know the exact web address of "Website A" in order to access it. Websites on the Network are not indexed in the same way as websites on the traditional Internet. Accordingly, unlike on the traditional Internet, a user could not simply perform a Google search for the name of "Website A," obtain the web address for "Website A," and click on a link to navigate to "Website A." Rather, a user had to have obtained the web address for "Website A" directly from another source, such as other users of "Website A," or from online postings describing both the sort of content available on "Website A" and its location. Accessing "Website A" therefore required numerous affirmative steps by the user, making it extremely unlikely that any user could have simply stumbled upon "Website A" without first understanding its content and knowing that its primary purpose was to advertise and distribute child pornography.

9.      The Network's software protects users' privacy online by bouncing their communications around a distributed network of relay computers run by volunteers all around the world, thereby masking the user's actual IP address which could otherwise be used to identify a user.

10.      The Network also makes it possible for users to hide their locations while offering various kinds of services, such as web publishing, forum/website hosting, or an instant messaging server. Within the Network itself, entire websites can be set up which operate the same as regular public websites with one critical exception - the IP address for the web server is hidden and instead is replaced with a Network-based web address. A user

13

2015R00778
EXHIBIT A-014
MICHAUD_000186

can only reach such sites if the user is using the Network client and operating in the Network. Because neither a user nor law enforcement can identify the actual IP address of the web server, it is not possible to determine through public lookups where the computer that hosts the website is located. Accordingly, it is not possible to obtain data detailing the activities of the users from the website server through public lookups.

Description of "Website A" and its Content

11.    "Website A" was a child pornography bulletin board and website dedicated to the advertisement and distribution of child pornography and the discussion of matters pertinent to the sexual abuse of children, including the safety and security of individuals who seek to sexually exploit children online. On or about February 20, 2015, the computer server hosting "Website A" was seized from a web-hosting facility in Lenoir, North Carolina. The website operated in Newington, Virginia, from February 20, 2015, until March 4, 2015, at which time "Website A" ceased to operate. Between February 20, 2015, and March 4, 2015, law enforcement agents acting pursuant to an order of the United States District Court for the Eastern District of Virginia monitored electronic communications of users of "Website A." Before, during, and after its seizure by law enforcement, law enforcement agents viewed, examined and documented the contents of "Website A," which are described below.

12.    According to statistics posted on the site, "Website A" contained a total of 117,773 posts, 10,622 total topics, and 214,898 total members as of March 4, 2015. The website appeared to have been operating since approximately August 2014, which is

14

when the first post was made on the message board.  On the main page of the site, located

to either side of the site name were two images depicting partially clothed prepubescent

girls with their legs spread apart, along with the text underneath stating, "No cross-board

reposts, .7z preferred, encrypt filenames, include preview, Peace out."  Based on my

training and experience, I know that: "no cross-board reposts" refers to a prohibition

against material that is posted on other websites from being "re-posted" to "Website A;"

and ".7z" refers to a preferred method of compressing large files or sets of files for

distribution.  Two data-entry fields with a corresponding "Login" button were located to

the right of the site name.  Located below the aforementioned items was the message,

"Warning! Only registered members are allowed to access the section. Please login below

or 'register an account' [(a hyperlink to the registration page)] with "[Website A]."

Below this message was the "Login" section, consisting of four data-entry fields with the

corresponding text, "Username, Password, Minutes to stay logged in, and Always stay

logged in."

13.     Upon accessing the "register an account" hyperlink, there was a message that

informed users that the forum required new users to enter an email address that looks to

be valid.  However, the message instructed members not to enter a real email address.

The message further stated that once a user registered (by selecting a user name and

password), the user would be able to fill out a detailed profile.  The message went on to

warn the user "[F]or your security you should not post information here that can be used

15

2015R00778
EXHIBIT A-016
MICHAUD_000188

1   to identify you." The message further detailed rules for the forum and provided other

2   recommendations on how to hide the user's identity for the user's own security.

3

4   14.     After accepting the above terms, registration to the message board then required a

5   user to enter a username, password, and e-mail account; although a valid e-mail account

6   was not required as described above.

7

8   15.     After successfully registering and logging into the site, the user could access any

9   number of sections, forums, and sub-forums. Some of the sections, forums, and sub-

10  forums available to users included: (a) How to; (b) General Discussion; (c) [Website A]

11  information and rules; and (d) Security & Technology discussion. Additional sections,

12  forums, and sub-forums included (a) Jailbait – Boy;  (b) Jailbait – Girl; (c) Preteen – Boy;

13  (d) Preteen – Girl; (e) Pre-teen Videos – Girl HC; (f) Pre-teen Videos – Boys HC; (g)

14  Toddlers; and (h) Kinky Fetish – Scat.  Based on my training and experience, I know that

15  "jailbait" refers to underage but post-pubescent minors; the abbreviation "HC" means

16  hardcore (i.e., depictions of penetrative sexually explicit conduct); and "scat" refers to the

17  use of feces in various sexual acts, watching someone defecating, or simply seeing the

18  feces.   An additional section and forum was also listed in which members could

19  exchange usernames on a Network-based instant messaging service that I know, based

20  upon my training and experience, to be commonly used by subjects engaged in the online

21  sexual exploitation of children.

22  16.     A review of the various topics within the above forums revealed each topic

23

24  contained a title, the author, the number of replies, the number of views, and the last post.

25

26

27

28

2015R00778
EXHIBIT A-017
MICHAUD_000189

The "last post" section of a particular topic included the date and time of the most recent posting to that thread as well as the author.  Upon accessing a topic, the original post appeared at the top of the page, with any corresponding replies to the original post included in the post thread below it.  Typical posts appeared to contain text, images, thumbnail-sized previews of images, compressed files (such as Roshal Archive files, commonly referred to as ".rar" files, which are used to store and distribute multiple files within a single file), links to external sites, or replies to previous posts.

17.     A review of the various topics within the "[Website A] information and rules," "How to," "General Discussion," and "Security & Technology discussion" forums revealed that the majority contained general information in regards to the site, instructions and rules for how to post, and welcome messages between users.

18.     A review of topics within the remaining forums revealed the majority contained discussions about, and numerous images that appeared to depict, child pornography and child erotica depicting prepubescent girls, boys, and toddlers.  Examples of these are as follows:

      a. On February 3, 2015, a user posted a topic entitled "Buratino-06" in the forum "Pre-teen – Videos - Girls HC" that contained numerous images depicting child pornography of a prepubescent or early pubescent girl.  One of these images depicted the girl being orally penetrated by the penis of a naked male;

      b. On January 30, 2015, a user posted a topic entitled "Sammy" in the forum "Pre-teen – Photos – Girls" that contained hundreds of images depicting child

2015R00778
EXHIBIT A-018
MICHAUD_000190

pornography of a prepubescent girl. One of these images depicted the female being orally penetrated by the penis of a male; and

    c.  On September 16, 2014, a user posted a topic entitled "9yo Niece - Horse.mpg" in the "Pre-teen Videos - Girls HC" forum that contained four images depicting child pornography of a prepubescent girl and a hyperlink to an external website that contained a video file depicting what appeared to be the same prepubescent girl. Among other things, the video depicted the prepubescent female, who was naked from the waist down with her vagina and anus exposed, lying or sitting on top of a naked adult male, whose penis was penetrating her anus.

19.    A list of members, which was accessible after registering for an account, revealed that approximately 100 users made at least 100 posts to one or more of the forums. Approximately 31 of these users made at least 300 posts. In total, "Website A" contained thousands of postings and messages containing child pornography images. Those images included depictions of nude prepubescent minors lasciviously exposing their genitals or engaged in sexually explicit conduct with adults or other children.

20.    "Website A" also included a feature referred to as "[Website A] Image Hosting." This feature of "Website A" allowed users of "Website A" to upload links to images of child pornography that are accessible to all registered users of "Website A." On February 12, 2015, an FBI Agent accessed a post on "Website A" titled "Giselita" which was created by a particular "Website A" user. The post contained links to images stored on

2015R00778
EXHIBIT A-019
MICHAUD_000191

"[Website A] Image Hosting."  The images depicted a prepubescent girl in various states of undress.  Some images were focused on the nude genitals of a prepubescent girl. Some images depicted an adult male's penis partially penetrating the vagina of a prepubescent girl.

21.     Text sections of "Website A" provided forums for discussion of methods and tactics to use to perpetrate child sexual abuse.

        a.  On January 8, 2015, a user posted a topic entitled "should i proceed?" in the forum "Stories - Non-Fiction" that contained a detailed accounting of an alleged encounter between the user and a 5 year old girl. The user wrote "...it felt amazing feeling her hand touch my dick even if it was through blankets and my pajama bottoms..."  The user ended his post with the question, "should I try to proceed?" and further stated that the girl "seemed really interested and was smiling a lot when she felt my cock."  A different user replied to the post and stated, "...let her see the bulge or even let her feel you up...you don't know how she might react, at this stage it has to be very playful..."

                Court Authorized Use of Network Investigative Technique

22.     Websites generally have Internet Protocol ("IP") address logs that can be used to locate and identify the site's users.  In such cases, after the seizure of a website whose users were engaging in unlawful activity, law enforcement could  review those logs in order to determine the IP addresses used by users of "Website A" to access the site.  A

2015R00778
EXHIBIT A-020
MICHAUD_000192

publicly available lookup could then be performed to determine what Internet Service

Provider ("ISP") owned the target IP address.  A subpoena could then be sent to that ISP

to determine the user to which the IP address was assigned at a given date and time.

23.     However, because of the Network software utilized by "Website A," any such logs

of user activity would contain only the IP addresses of the last computer through which

the communications of "Website A" users were routed before the communications

reached their destinations. The last computer is not the actual user who sent the

communication or request for information, and it is not possible to trace such

communications back through the Network to that actual user.  Such IP address logs

therefore could not be used to locate and identify users of "Website A."

24.     Accordingly, on February 20, 2015, the same date "Website A" was seized, the

United States District Court for the Eastern District of Virginia authorized a search

warrant to allow law enforcement agents to deploy a Network Investigative Technique

("NIT") on "Website A" in an attempt to identify the actual IP addresses and other

identifying information of computers used to access "Website A."  Pursuant to that

authorization, between February 20, 2015, and approximately March 4, 2015, each time

any user or administrator logged into "Website A" by entering a username and password,

the FBI was authorized to deploy the NIT which would send one or more

communications to the user's computer.  Those communications were designed to cause

the receiving computer to deliver to a computer known to or controlled by the

government data that would help identify the computer, its location, other information

2015R00778
EXHIBIT A-021
MICHAUD_000193

about the computer, and the user of the computer accessing "Website A." That data

included: the computer's actual IP address, and the date and time that the NIT

determined what that IP address was; a unique identifier generated by the NIT (e.g., a

series of numbers, letters, and/or special characters) to distinguish the data from that of

other computers; the type of operating system running on the computer, including type

(e.g., Windows), version (e.g., Windows 7), and architecture (e.g., x 86); information

about whether the NIT had already been delivered to the computer; the computer's Host

Name; the computer's active operating system username; and the computer's MAC

address.

<u>Summary of Pewter on "Website A"</u>

25.    According to data obtained from logs on "Website A," monitoring by law

enforcement and the deployment of a NIT, a user with the user name Pewter engaged in

the following activity on "Website A."

26.    The profile page of user Pewter indicated this user originally registered an account

on "Website A" on October 31, 2014. Profile information on "Website A" may include

contact information and other information that is supplied by the user. It also contains

information about that user's participation on the site, including statistical information

about the user's posts to the site and a categorization of those posts. According to the

user Pewter's profile, this user was a Newbie Member of "Website A." Further,

according to the Statistics section of this user's profile, the user Pewter had been actively

21

2015R00778
EXHIBIT A-022
MICHAUD_000194

logged into the website for a total of 99 hours between the dates of October 31, 2014, and March 2, 2015.

27.    User "Pewter" viewed 187 different threads on "Website A" including threads with the titles:        "10yo teen with anal front with his father";

"2012, Lolita Cat Goddess 4";

"alicia 10 yo little girl loves adult sex (cum in mouth)";

 "7yo APRIL hj bj finger pencil in ass vib cum"; and

"Lauri ~8yo 3 videos, tasting cum".

28.    Most of the threads viewed by Pewter included links to view files and comments regarding child pornography.  Pewter was observed accessing "Website A" on seven of the ten days during the period of February 21, 2015 through March 2, 2015.

IP Address and Identification of User Pewter on "Website A"

29.    According to data obtained from logs on "Website A," monitoring by law enforcement, and the deployment of a NIT, on February 28, 2015, the user Pewter engaged in the following activity on "Website A" from IP address 73.164.163.63. During the session described below, this user browsed "Website A" after logging into "Website A" with a username and a password.

30.    On February 28, 2015, the user Pewter with IP address 73.164.163.63 accessed the post entitled "Girl 12ish eats other girls/dirty talk" in the section "Pre-teen Videos >> Girls HC". Among other things, this post contained a download link to a .html file with the password provided to conduct the download.

2015R00778
EXHIBIT A-023
MICHAUD_000195

31.     During the following additional sessions, the user Pewter also browsed "Website A" after logging into "Website A" with a username and password.  During these sessions, the user's IP address information was not collected.

32.     On March 2, 2015, the user Pewter accessed a post that contained a link to an image that depicted a prepubescent female being anally penetrated by the erect penis of an adult male.

33.     On March 2, 2015, the user Pewter accessed a post that contained a link to the same aforementioned image, which depicted a prepubescent female being anally penetrated by the erect penis of an adult male.

34.     I have reviewed the images that were accessed by Pewter on March 2, 2015.  The images depict a prepubescent female's nude crotch.  There is a total lack of pubic and body hair on the female, and the female appears to be prepubuscent in size. The female's legs are spread apart and her vagina is exposed.  An adult male's erect penis is penetrating the minor female's anus.

35.     Using publicly available websites, FBI Special Agents were able to determine that the above IP Address was operated by the Internet Service Provider ("ISP") Comcast.

36.     In March 2015, an administrative subpoena/summons was served to Comcast requesting information related to the user who was assigned to the above IP address.  According to the information received from Comcast, Jay Michaud was receiving Internet service at 2201 NE 112th Ave., Unit D39, Vancouver, WA 98684, with the same address being listed as the billing address. Internet service was initiated at the

23

***PROTECTED***

1   aforementioned premises on October 1, 2014 and was current as of March 9, 2015.  The

2   information received from Comcast also listed account number 877810104138548 and

3
4   telephone number 360-977-8555.

5   37.     A search of the LexisNexis Accurint information database (a public records

6   database that provides names, dates of birth, addresses, associates, telephone numbers,

7   email addresses, etc.) and other public databases was conducted for Jay Michaud, 2201

8
9   NE 112th Ave., Apartment D39, Vancouver, WA 98684.  These public records indicated

10  that Jay Michaud's current address is 5264 121st Ave. NE, Apartment 150, Vancouver,

11
12  WA 98682.  The reported date of that address for Michaud was May 8, 2015.  These

13  public records also indicated that a previous address for Jay Michaud was 2201 NE 112th

14  Ave., Apartment D39, Vancouver, WA 98684.  The latest report date for that address was

15
16  March 11, 2015.

17  38.     Another search of the LexisNexis Accurint information database was done for

18  5264 121st Ave. NE, Apartment 150, Vancouver, WA and 2201 NE 112th Ave.,

19
20  Apartment D39, Vancouver, WA.  That search indicated that during the times that those

21  addresses were occupied by Jay Michaud, there were no other listed occupants at those

22  addresses.

23
24  39.     In June of 2015, another administrative subpoena was served to Comcast

25  requesting information related to the account of Jay Michaud with account number

26  8778101014138548.  According to the information received from Comcast, that account

27  had been disconnected as of May 8, 2015.  The information received from Comcast

28

24

2015R00778
EXHIBIT A-025
MICHAUD_000197

indicated that account number 8778101014138548 associated with Jay Michaud had been

transferred to a new account with subscriber name Jay Michaud with subscriber address

5264 NE 121st Ave., Apartment 150, Vancouver, WA 98682.

40.     On June 16, 2015, I reviewed the Clark County Public Utilities database.  The

database indicated that services are being provided to Jay Michaud at 5264 NE 121st

Ave., Apartment Q150, Vancouver, WA 98682 with home telephone number 390-977-

8555, and services start date of May 8, 2015.

41.     In June of 2015, a third administrative subpoena was served to Comcast requesting

information related to the account of Jay Michaud at 5264 NE 121st Ave., Apartment 150,

Vancouver, WA 98682.  According to the information received from Comcast, Jay

Michaud was receiving Internet service at 5264 NE 121st Ave., Apartment 150,

Vancouver, WA 98682.  Internet service was initiated at the aforementioned premises on

May 8, 2015, and was current as of June 23, 2015.  The information received from

Comcast also listed telephone number 360-977-8555.

42.     I have conducted surveillance at the TARGET PREMISES.  On July 7, 2015, I

noted that a Nissan Altima with Washington Plate ARL3559 was parked in the parking

lot near the TARGET PREMISES.  A vehicle registration check was conducted for

Washington Plate ARL3559 and that license came back to a 2008 Nissan Altima

registered to Jay E. Michaud at 2201 NE 112th Ave., Apt D39, Vancouver, WA.

43.     I have reviewed Washington State Employment records showing that from the 4th

Quarter of 2013 through the 1st Quarter of 2015, Jay Michaud was employed with the

2015R00778
EXHIBIT A-026
MICHAUD_000198

Vancouver School District 37. I have also reviewed information on the website

data.kitsapsun.com, which maintains a database for teachers' salaries and teaching

experience in the state of Washington. The site, data.kitsapsun.com, shows Jay Michaud

as an employee of the Vancouver School District with 11 years of certified experience. I

have reviewed the staff directory of Gaiser Middle School as reflected on their website.

Gaiser Middle School is a middle school in the Vancouver School District. The staff

directory reflects that Jay Michaud is a part of the Special Education Department at

Gaiser Middle School.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO ACCESS WITH INTENT TO VIEW AND/OR COLLECT, RECEIVE, OR DISTRIBUTE CHILD PORNOGRAPHY

44.     Based on my previous investigative experience related to child pornography

investigations, and the training and experience of other law enforcement officers with

whom I have had discussions, I know there are certain characteristics common to

individuals who utilize web based bulletin boards to access with intent to view and/or

possess, collect, receive or distribute images of child pornography:

     a. Individuals who access with intent to view and/or possess, collect, receive or

        distribute child pornography may receive sexual gratification, stimulation, and

        satisfaction from contact with children; or from fantasies they may have

        viewing children engaged in sexual activity or in sexually suggestive poses,

        such as in person, in photographs, or other visual media; or from literature

        describing such activity.

26

2015R00778
EXHIBIT A-027
MICHAUD_000199

b.  Individuals who access with intent to view and/or possess, collect, receive or distribute child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.  Individuals who access with intent to view and/or possess, collect, receive or distribute child pornography almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location.  Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d.  Likewise, individuals who access with intent to view and/or possess, collect, receive or distribute pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a

2015R00778
EXHIBIT A-028
MICHAUD_000200

computer and surrounding area. These collections are often maintained for

several years and are kept close by, usually at the collector's residence or

inside the collector's vehicle, to enable the individual to view the collection,

which is valued highly.

e.  Individuals who access with intent to and/or possess, collect, receive or

distribute child pornography also may correspond with and/or meet others to

share information and materials; rarely destroy correspondence from other

child pornography distributors/collectors; conceal such correspondence as they

do their sexually explicit material; and often maintain lists of names, addresses,

and telephone numbers of individuals with whom they have been in contact

and who share the same interests in child pornography.

f.  Individuals who would have knowledge about how to access a hidden and

embedded bulletin board would have gained knowledge of its location through

online communication with others of similar interest. Other forums, such as

bulletin boards, newsgroups, IRC chat or chat rooms have forums dedicated to

the trafficking of child pornography images. Individuals who utilize these

types of forums are considered more advanced users and therefore more

experienced in acquiring a collection of child pornography images.

g.  Individuals who access with intent to view and/or possess, collect, receive or

distribute child pornography prefer not to be without their child pornography

for any prolonged time period. This behavior has been documented by law

2015R00778
EXHIBIT A-029
MICHAUD_000201

enforcement officers involved in the investigation of child pornography throughout the world.

45.     Based on the following, I believe that a user of the Internet account at SUBJECT PREMISES, likely displays characteristics common to individuals who access with the intent to view and/or, possess, collect, receive, or distribute child pornography.  For example, the user :

   a.  Began accessing "Website A" on October 31, 2014 and continued to access "Website A" through March 2, 2015.

   b.  Spent a total amount of over 99 hours logged on to "Website A"

   c.  Viewed 187 different threads on "Website A" including threads with the titles, "10yo teen with anal front with his father", "2012, Lolita Cat Goddess 4, alicia 10 yo little girl loves adult sex (cum in mouth)", "7yo APRIL hj bj finger pencil in ass vib cum" and "Lauri ~8yo 3 videos, tasting cum".

   d.  Was observed on "Website A" on seven of the ten days during the period  of February 21, 2015 through March 2, 2015.

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

46.     Computers and digital technology have dramatically changed the way in which individuals interested in child pornography interact with each other.  Computers basically serve four functions in connection with child pornography:  production, communication, distribution, and storage.

2015R00778
EXHIBIT A-030
MICHAUD_000202

47.     Child pornographers can now transfer printed photographs into a computer-readable format with a device known as a scanner.  Furthermore, with the advent of digital cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a computer by simply connecting the camera to the computer.  In the last ten years, the resolution of pictures taken by digital cameras has increased dramatically, meaning the photos taken with digital cameras have become sharper and crisper.  Photos taken on a digital camera are stored on a removable memory card in the camera.  These memory cards often store up to 32 gigabytes of data, which provides enough space to store thousands of high-resolution photographs.  Video camcorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive in the camera.  The video files can be easily transferred from the camcorder to a computer.

48.     A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.  Electronic contact can be made to literally millions of computers around the world.  The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography.  Child pornography can be transferred via electronic mail or through file transfer protocols (FTPs) to anyone with access to a computer and modem.  Because of the proliferation of commercial services that provide electronic mail service,

2015R00778
EXHIBIT A-031
MICHAUD_000203

chat services (i.e., "Instant Messaging"), and easy access to the Internet, the computer is a

preferred method of distribution and receipt of child pornographic materials.

49.     The computer's ability to store images in digital form makes the computer itself an

ideal repository for child pornography.  The size of the electronic storage media

(commonly referred to as the hard drive) used in home computers has grown

tremendously within the last several years.  These drives can store thousands of images at

very high resolution.  In addition, there are numerous options available for the storage of

computer or digital files.  One-Terabyte external and internal hard drives are not

uncommon.  Other media storage devices include CDs, DVDs, and "thumb," "jump," or

"flash" drives, which are very small devices which are plugged into a port on the

computer.  It is extremely easy for an individual to take a photo with a digital camera,

upload that photo to a computer, and then copy it (or any other files on the computer) to

any one of those media storage devices (CDs and DVDs are unique in that special

software must be used to save or "burn" files onto them).  Media storage devices can

easily be concealed and carried on an individual's person.

50.     The Internet affords individuals several different venues for obtaining, viewing,

and trading child pornography in a relatively secure and anonymous fashion.

51.     Individuals also use online resources to retrieve and store child pornography,

including services offered by Internet Portals such as Yahoo! and Hotmail, among others.

The online services allow a user to set up an account with a remote computing service

that provides e-mail services as well as electronic storage of computer files in any variety

31

2015R00778
EXHIBIT A-032
MICHAUD_000204

of formats.  A user can set up an online storage account from any computer with access to the Internet.  Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer or external media in most cases.

52.     As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.  Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files.  Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others).  In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.  Such information is often maintained indefinitely until overwritten by other data.

## SEARCH AND/OR SEIZURE OF DIGITAL DEVICES

53.     In addition, based on my training and experience and that of computer forensic agents that I work and collaborate with on a daily basis, I know that in most cases it is impossible to successfully conduct a complete, accurate, and reliable search for electronic evidence stored on a digital device during the physical search of a search site for a number of reasons, including but not limited to the following:

     a.  Technical Requirements:  Searching digital devices for criminal evidence is a
        highly technical process requiring specific expertise and a properly controlled

2015R00778
EXHIBIT A-033
MICHAUD_000205

environment.  The vast array of digital hardware and software available
requires even digital experts to specialize in particular systems and
applications, so it is difficult to know before a search which expert is qualified
to analyze the particular system(s) and electronic evidence found at a search
site.  As a result, it is not always possible to bring to the search site all of the
necessary personnel, technical manuals, and specialized equipment to conduct
a thorough search of every possible digital device/system present.  In addition,
electronic evidence search protocols are exacting scientific procedures
designed to protect the integrity of the evidence and to recover even hidden,
erased, compressed, password-protected, or encrypted files.  Since
electronically stored information ("ESI") is extremely vulnerable to inadvertent
or intentional modification or destruction (both from external sources or from
destructive code embedded in the system such as a "booby trap"), a controlled
environment is often essential to ensure its complete and accurate analysis.

b.  Volume of Evidence:  The volume of data stored on many digital devices is
typically so large that it is impossible to search for criminal evidence in a
reasonable period of time during the execution of the physical search of a
search site.  A single megabyte of storage space is the equivalent of 500
double-spaced pages of text.  A single gigabyte of storage space, or 1,000
megabytes, is the equivalent of 500,000 double-spaced pages of text. Computer
hard drives are now being sold for personal computers capable of storing up to

33

two terabytes (2,000 gigabytes of data.)  Additionally, this data may be stored in a variety of formats or may be encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer).

c.  Search Techniques:  Searching the ESI for the items described in Attachment B may require a range of data analysis techniques.  In some cases, it is possible for agents and analysts to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.   In other cases, however, such techniques may not yield the evidence described in the warrant, and law enforcement personnel with appropriate expertise may need to conduct more extensive searches, such as scanning areas of the disk not allocated to listed files, or peruse every file briefly to determine whether it falls within the scope of the warrant.

54.   In this particular case, the government anticipates the use of a hash value library to exclude normal operating system files that do not need to be searched, which will facilitate the search for evidence that does come within the items described in Attachment B. Further, the government anticipates the use of hash values and known file filters to assist the digital forensics examiners/agents in identifying known and or suspected child pornography image files.  Use of these tools will allow for the quick identification of

2015R00778
EXHIBIT A-035
MICHAUD_000207

evidentiary files but also assist in the filtering of normal system files that would have no bearing on the case.

55.     In accordance with the information in this Affidavit, law enforcement personnel will execute the search of digital devices seized pursuant to this warrant as follows:

    a. Upon securing the search site, the search team will conduct an initial review of any digital devices/systems to determine whether the ESI contained therein can be searched and/or duplicated on site in a reasonable amount of time and without jeopardizing the ability to accurately preserve the data.

    b. If, based on their training and experience, and the resources available to them at the search site, the search team determines it is not practical to make an on-site search, or to make an on-site copy of the ESI within a reasonable amount of time and without jeopardizing the ability to accurately preserve the data, then the digital devices will be seized and transported to an appropriate law enforcement laboratory for review and to be forensically copied ("imaged"), as appropriate.

    c. In order to examine the ESI in a forensically sound manner, law enforcement personnel with appropriate expertise will produce a complete forensic image, if possible and appropriate, of any digital device that is found to contain data or items that fall within the scope of Attachment B of this Affidavit. In addition, appropriately trained personnel may search for and attempt to recover deleted, hidden, or encrypted data to determine whether the data fall within the list of

35

items to be seized pursuant to the warrant.  In order to search fully for the items identified in the warrant, law enforcement personnel, which may include investigative agents, may then examine all of the data contained in the forensic image/s and/or on the digital devices to view their precise contents and determine whether the data fall within the list of items to be seized pursuant to the warrant.

d.  The search techniques that will be used will be only those methodologies, techniques and protocols as may reasonably be expected to find, identify, segregate and/or duplicate the items authorized to be seized pursuant to Attachment B to this Affidavit.

e.  If, after conducting its examination, law enforcement personnel determine that any digital device is an instrumentality of the criminal offenses referenced above, the government may retain that device during the pendency of the case as necessary to, among other things, preserve the instrumentality evidence for trial, ensure the chain of custody, and litigate the issue of forfeiture.

56.  In order to search for ESI that falls within the list of items to be seized pursuant to Attachment B to this Affidavit, law enforcement personnel will seize and search the following items (heretofore and hereinafter referred to as "digital devices"), subject to the procedures set forth above:

a.  Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

36

b. Any digital device used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, cameras, encryption devices, and optical scanners;

c. Any magnetic, electronic, or optical storage device capable of storing data, such as disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, printer or memory buffers, smart cards, PC cards, memory sticks, flashdrives, thumb drives, camera memory cards, media cards, electronic notebooks, and personal digital assistants;

d. Any documentation, operating logs and reference manuals regarding the operation of the digital device, or software;

e. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the device hardware, or ESI to be searched;

f. Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the digital device, or ESI; and

g. Any passwords, password files, test keys, encryption codes or other information necessary to access the digital device or ESI.

### Instrumentalities

57. Based on the information in this Affidavit, I also believe that the digital device(s) at the SUBJECT PREMISES are instrumentalities of crime and constitute the means by

37

1  which violations of 18 U.S.C. § 2252(a)(2) (Receipt or Distribution of Child

2  Pornography) and 18 U.S.C. § 2252(a)(4)(B) (Possession of Child Pornography) have

3  been committed.  Therefore, I believe that in addition to seizing the digital devices to

4  conduct a search of their contents as set forth herein, there is probable cause to seize

5

6  those digital devices as instrumentalities of criminal activity.

7

8                                                        **Conclusion**

9  58.     Based on the foregoing, there is probable cause to believe that the federal criminal

10  statutes cited herein have been violated, and that the contraband, property, evidence,

11

12  fruits and instrumentalities of these offenses, more fully described in Attachment B of

13  this Affidavit, are located at the SUBJECT PREMISES, described in Attachment A.  I

14  respectfully request that this Court issue a search warrant for the SUBJECT PREMISES,

15  authorizing the seizure and search of the items described in Attachment B.

16

17

18

19                                         Special Agent Samuel A. Mautz

20                                         Federal Bureau of Investigation

21

22

23  *The above-named agent provided a sworn statement attesting to the truth of the*

24  *contents of the foregoing affidavit on* 9th *day of* July *, 20* 15

25

26

27  *DAVID W. CHRISTEL*

28  *Magistrate Judge*

2015R00778

**EXHIBIT A-039**
MICHAUD_000211

# ATTACHMENT A

## DESCRIPTION OF LOCATION TO BE SEARCHED

The location known as 5264 NE 121st Ave, Apt 150, Vancouver, WA 98682 is

identified as follows:  an apartment located in the building labeled "Q" in the One Lake

Place apartment complex.  Apartment 150 is accessed from the stairwell in the middle of

building "Q".  Apartment 150 is on the third floor and is the doorway to the right or south

at the top of the stairs.

The premises to be searched includes any appurtenances to the real property that is the

SUBJECT PREMISES of 5264 NE 121st Ave, Apt 150, Vancouver, WA 98682 including

any storage units/outbuildings or garages and 2008 Nissan Altima with Washington

License Plate ARL 3559.  The vehicle described has been seen parked near SUBJECT

PREMISES and is registered to Jay Michaud at Michaud's previous residence address.

Jay Michaud has moved primary residence in the past three months and would likely

have used his vehicle to transport items from his previous residence to his current

residence.  Digital media and items to be described in Attachment B could also be easily

stored and concealed in a vehicle.

39

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## PICTURE





40

2015R00778
EXHIBIT A-041
MICHAUD_000213

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **ATTACHMENT B**

### **Information to be Seized**

The following materials, which constitute evidence of the commission of a criminal

offense, contraband, the fruits of crime, or property designed or intended for use or which

is or has been used as the means of committing a criminal offense, namely violations of

Title 18, United States Code, Sections 2251 and 2252:

1. Computers or storage media used as a means to commit the violations described

    above.

2. For any computer or storage medium whose seizure is otherwise authorized by this

    warrant, and any computer or storage medium that contains or in which is stored

    records or information that is otherwise called for by this warrant (hereinafter,

    "COMPUTER"):

    a. evidence of who used, owned, or controlled the COMPUTER at the time

        the things described in this warrant were created, edited, or deleted, such as

        logs, registry entries, configuration files, saved usernames and passwords,

        documents, browsing history, user profiles, email, email contacts, "chat,"

        instant messaging logs, photographs, and correspondence;

    b. evidence of software that would allow others to control the COMPUTER,

        such as viruses, Trojan horses, and other forms of malicious software, as

        well as evidence of the presence or absence of security software designed to

        detect malicious software;

41

EXHIBIT A-042
MICHAUD_000214

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

2015R00778
EXHIBIT A-043
MICHAUD_000215

    m.  contextual information necessary to understand the evidence described in this attachment.

3. Routers, modems, and network equipment used to connect computers to the Internet.

4. Child pornography and child erotica.

5. Records, information, and items relating to violations of the statutes described above including

    a.  Records, information, and items relating to the occupancy or ownership of 5264 NE 121st Ave, Apt 150, Vancouver, WA 98682 including utility and telephone bills, mail envelopes, or addressed correspondence; Records, information, and items relating to the ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes;

    b.  Records and information relating to the identity or location of the persons suspected of violating the statutes described above; and

    c.  Records and information relating to sexual exploitation of children, including correspondence and communications between users of Website A.

2015R00778
EXHIBIT A-044
MICHAUD_000216

## Search Protocol

In accordance with the information in the Affidavit, law enforcement personnel will execute the search of digital devices seized pursuant to this warrant as follows:

      a.     Upon securing the search site, the search team will conduct an initial review of any digital devices/systems to determine whether the ESI contained therein can be searched and/or duplicated on site in a reasonable amount of time and without jeopardizing the ability to accurately preserve the data.

      b.     If, based on their training and experience, and the resources available to them at the search site, the search team determines it is not practical to make an on-site search, or to make an on-site copy of the ESI within a reasonable amount of time and without jeopardizing the ability to accurately preserve the data, then the digital devices will be seized and transported to an appropriate law enforcement laboratory for review and to be forensically copied ("imaged"), as appropriate.

      c.     In order to examine the ESI in a forensically sound manner, law enforcement personnel with appropriate expertise will produce a complete forensic image, if possible and appropriate, of any digital device that is found to contain data or items that fall within the scope of this Attachment B.  In addition, appropriately trained personnel may search for and attempt to recover deleted, hidden, or encrypted data to determine whether the data fall within the list of items to be seized pursuant to the warrant.  In order to search fully for the items identified in the warrant, law enforcement personnel, which may include investigative agents, may then examine all of the data

44

contained in the forensic image/s and/or on the digital devices to view their precise contents and determine whether the data fall within the list of items to be seized pursuant to the warrant.

d.      The search techniques that will be used will be only those methodologies, techniques and protocols as may reasonably be expected to find, identify, segregate and/or duplicate the items authorized to be seized pursuant to this Attachment B.

e.      If, after conducting its examination, law enforcement personnel determine that any digital device is an instrumentality of the criminal offenses referenced above, the government may retain that device during the pendency of the case as necessary to, among other things, preserve the instrumentality evidence for trial, ensure the chain of custody, and litigate the issue of forfeiture.

In order to search for ESI that falls within the list of items to be seized pursuant to Attachment B to this Affidavit, law enforcement personnel will seize and search the following items (heretofore and hereinafter referred to as "digital devices"), subject to the procedures set forth above:

a.      Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.      Any digital device used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, cameras, encryption devices, and optical scanners;

45

2015R00778
EXHIBIT A-046
MICHAUD_000218

c.      Any magnetic, electronic, or optical storage device capable of storing data, such as disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, printer or memory buffers, smart cards, PC cards, memory sticks, flashdrives, thumb drives, camera memory cards, media cards, electronic notebooks, and personal digital assistants;

d.      Any documentation, operating logs and reference manuals regarding the operation of the digital device, or software;

e.      Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the device hardware, or ESI to be searched;

f.      Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the digital device, or ESI; and

g.      Any passwords, password files, test keys, encryption codes or other information necessary to access the digital device or ESI.

2015R00778
EXHIBIT A-047
MICHAUD_000219

1

```
_____ FILED  _____ LODGED
               RECEIVED
      JUL 09 2015
       CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY                              DEPUTY
```

Magistrate Judge David W. Christel

2

3

4

5

6

7   UNITED STATES DISTRICT COURT FOR THE
8   WESTERN DISTRICT OF WASHINGTON
    AT TACOMA

9

10  <u>IN THE MATTER OF THE SEARCH OF:</u>   NO. MJ 15-5111

11  5264 NE 121st Ave, Apartment 150,   MOTION TO SEAL SEARCH
12  Vancouver, WA 98682   WARRANT AND RELATED
    MATERIALS

13

14  _____   **(FILED UNDER SEAL)**

15      The United States of America, by and through Annette L. Hayes, Acting United

16  States Attorney for the Western District of Washington, and S. Kate Vaughan, Assistant

17  United States Attorney, respectfully requests that this Search Warrant, Application for

18  Search Warrant, and related documents in this matter, including this Motion and its

19  attendant Order, be sealed pending further order of the Court to protect the ongoing

20  criminal investigation.  The United States of America further respectfully requests that

21  notwithstanding the requested sealing order, the Government retain the authority to

22  produce the materials subject to this Court's sealing order as part of its discovery

23  obligations in a criminal case.

24      Federal courts are empowered to seal documents in appropriate circumstances.  *Cf.*

25  Fed. R. Crim. P. 6(e)(4) (sealing of indictments).  It is well-settled that federal courts

26  have inherent authority to control papers filed with the court, *United States v. Shryock,*

27  342 F.3d 948, 983 (9th Cir. 2003), including the power to seal affidavits filed with search

28  warrants in appropriate circumstances.  In *Times Mirror Company v. United States,* 873

MOTION TO SEAL SEARCH WARRANT - 1

EXHIBIT A-048
MICHAUD_000220

1   F.2d 1210 (9th Cir. 1989), the Court recognized that "information disclosed to the
2   magistrate in support of the warrant request is entitled to the same confidentiality
3   accorded other aspects of the criminal investigation." *Id.* at 1214. This inherent power
4   may appropriately be exercised when disclosure of the affidavit would disclose facts that
5   would interfere with an ongoing criminal investigation. *United States v. Napier*, 436
6   F.3d 1133, 1136 (9th Cir. 2006) (noting that a sealed search warrant protects the
7   "government's interest in maintaining [the] integrity of ongoing criminal investigations
8   and ensuring the safety of the informant").

9   　　　In support of this request, the government states that the public disclosure of any
10  of these materials at this juncture could jeopardize the government's ongoing
11  investigation in this case because the case involves a multi-state investigation of
12  numerous targets involved in receipt and possession and distribution of child
13  pornography through specific websites. Thus public disclosure of these materials could
14  cause the targets of the investigation to destroy evidence or flee prosecution.

15  　　　Therefore, the United States of America respectfully requests that the documents
16  in this case be sealed until sealed until the earliest of the following: (a) two weeks
17  following the unsealing of any charging document in a matter for which the warrants
18  were issued; (b) two weeks following the closure of the investigation for which the
19  warrants were issued; or (c) sixteen months following issuance of the warrant, unless the
20  Court, upon motion of the government for good cause, orders an extension of the Order.
21  DATED 8th Day of July, 2015.

22

23　　　　　　　　　　　　　　　　　Respectfully submitted,
24　　　　　　　　　　　　　　　　　ANNETTE L. HAYES
　　　　　　　　　　　　　　　　　　Acting United States Attorney
25

26

27　　　　　　　　　　　　　　　　　_s/ S. Kate Vaughan_____
　　　　　　　　　　　　　　　　　　S. Kate Vaughan
28　　　　　　　　　　　　　　　　　Assistant United States Attorney

MOTION TO SEAL SEARCH WARRANT - 2

EXHIBIT A-049
MICHAUD_000221



Magistrate Judge David W. Christel

1
2
3
4
5
6
7    UNITED STATES DISTRICT COURT FOR THE
8    WESTERN DISTRICT OF WASHINGTON
     AT TACOMA  MJ15-5111
9
10   IN THE MATTER OF THE SEARCH OF:        **ORDER SEALING SEARCH**
11                                          **WARRANT AND RELATED**
12                                          **MATERIALS**
     5264 NE 121st Ave, Apartment 150,
13   Vancouver, WA 98682                    **(FILED UNDER SEAL)**
14

15        Based upon the motion of the United States, and the representations made therein,

16   and good cause having been show:

17        IT IS HEREBY ORDERED that the search warrant, search warrant return,

18   application and affidavits in support of the same, and all attachments in this matter, along

19   with this motion and order, shall be sealed and shall remain sealed  until the earliest of

20   the following: (a) two weeks following the unsealing of any charging document in a

21   matter for which the warrants were issued; (b) two weeks following the closure of the

22   investigation for which the warrants were issued; or (c) sixteen months following

23   issuance of the warrant, unless the Court, upon motion of the government for good cause,

24   orders an extension of this Order.  Nothing in this Order is intended to create or

25   supersede any other applicable obligation under law.

26        IT IS FURTHER ORDERED, that on or before the earliest of the dates specified

27   above, the government shall file a motion in which it either (1) provides good cause for a

28   further order of this Court permitting these documents to remain under seal for an

ORDER TO SEAL - 1
USAO#: 2015R00778
CAUSE NO.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

**EXHIBIT A-050**
MICHAUD_000222

1  additional period of time, or (2) requests an order of this Court to unseal this warrant and

2  all related documents, including the motion and order to seal the same. In the event the

3  government fails to file the motion required by this Order on or before the earliest of the

4  three triggering events, and the Court has not otherwise extended the sealing period

5  following a showing of good cause by the government, the Clerk of Court shall unseal

6  this warrant and all related documents without further order of the Court.

7      IT IS SO ORDERED.

8

9                                    _____
                                     DAVID W. CHRISTEL
10                                   United States Magistrate Judge

11

12  Presented by:

13

14  s/ S. Kate Vaughan
    _____
15  S. KATE VAUGHAN
    Assistant United States Attorney

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER TO SEAL - 2
USAO#: 2015R00778
CAUSE NO.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

AO 93  (Rev. 11/13)  Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Western District of Washington

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>5264 NE 121st Ave, Apartment 150<br>Vancouver, WA 98682 | )<br>)<br>)<br>)<br>)<br>) | Case No. MJ15-5111 |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Western _____ District of _____ Washington _____
*(identify the person or describe the property to be searched and give its location)*:

The residence at 5264 NE 121st Ave, Apartment 150, Vancouver, WA 98682 as further described in Attachment A, which is attached hereto and incorporated herein by this reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached hereto and incorporated herein by this reference.

**YOU ARE COMMANDED** to execute this warrant on or before ____7-23-2015____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ DAVID W. CHRISTEL _____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   7/9/2015   1:05 pm

Judge's signature

City and state:   TACOMA, WASHINGTON            DAVID W. CHRISTEL, U.S. MAGISTRATE JUDGE
*Printed name and title*

EXHIBIT A-052
2015R00778
MICHAUD_000224

***PROTECTED***

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

EXHIBIT A-053
2015R00778
MICHAUD_000225