Judge Robert J. Bryan

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JAY MICHAUD,<br><br>Defendant. | NO. CR15-535RJB<br><br>UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO DISMISS INDICTMENT |

The United States of America, by and through Annette L. Hayes, United States Attorney for the Western District of Washington, Matthew P. Hampton and Andre M. Penalver, Assistant United States Attorneys for said District, and Keith A. Becker, Trial Attorney, hereby files this response to the defendant's motion to dismiss the Indictment.

## I. BACKGROUND

Michaud is charged in this case with receipt and possession of child pornography. These charges followed a search of his residence and seizure of computers and digital devices within his custody and control that contained illicit child pornography. The FBI identified Michaud as a suspect during a larger investigation into a child pornography website, which operated on the anonymous Tor network. In late February 2015, the FBI briefly seized and assumed administrative control of that website—a site that had already

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 1

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 been operating for six months—for approximately two weeks in order to deploy a court-
2 authorized investigative technique in an effort to identify its users.  The FBI did not
3 create the website and Michaud had registered as a user of the site long before law
4 enforcement seized it.  The FBI provided no inducement to Michaud to access child
5 pornography, nor did the FBI post any child pornography, or any links to child
6 pornography, on the website.  Moreover, the brief continued operation of the site was
7 necessary in order for the FBI to obtain identifying information about its users, pursuant
8 to court authorization, in light of the nature of the crime and criminal suspects' use of the
9 anonymous Tor network.

10       On November 20, 2015, Michaud filed a motion to dismiss the Indictment in this
11 case for alleged "outrageous government conduct."  Applying settled Ninth Circuit
12 precedent to the facts of this case, there is no basis to dismiss the Indictment, and
13 Michaud's motion should be denied.

## II.   LEGAL STANDARDS

"Outrageous government conduct occurs when the actions of law enforcement officers or informants are 'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'"  *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013) (quoting *United States v. Russell*, 411 U.S. 423, 431–32 (1973)).  To obtain dismissal of an indictment for outrageous government conduct, the defendant must meet an "extremely high standard."  *United States v. Garza–Juarez*, 992 F.2d 896, 904 (9th Cir. 1993).  Dismissal is "limited to extreme cases" in which the defendant can demonstrate that the government's conduct "violates fundamental fairness" and is "so grossly shocking and so outrageous as to violate the universal sense of justice."  *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011) (quoting *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991) (internal quotation marks omitted)).  In fact, the government has found only two reported decisions in which federal appellate courts have reversed a conviction under this doctrine.  *Compare United*

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 2

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  *States v. Twigg*, 588 F.2d 373 (3d Cir. 1978) (holding government conduct outrageous
2  because it "generated new crimes by the defendant merely for the sake of pressing
3  criminal charges against him when . . . he was lawfully and peacefully minding his own
4  affairs"), *and Greene v. United States*, 454 F.2d 783 (9th Cir. 1971) (holding government
5  conduct outrageous where it had initiated a criminal scheme and was involved for two
6  and a half to three and a half years "directly and continuously . . . in the creation and
7  maintenance of criminal operations"), *with United States v. Gurolla*, 333 F.3d 944, 950
8  (9th Cir. 2003) (holding government conduct not outrageous when, as here, "the
9  government merely infiltrates an existing organization, approaches persons it believes to
10 be already engaged in or planning to participate in the conspiracy, or provides valuable
11 and necessary items to the venture").
12        Indeed, the standard for a dismissal based on outrageous government conduct is so
13 high that the Ninth Circuit has on several occasions refused to find outrageous
14 government conduct in the context of "reverse" sting operations, wherein the government
15 initiates the criminal conduct by inventing a fictional criminal scenario and then
16 prosecutes those defendants who attempt to participate in it.  *See, e.g.*, *United States v.*
17 *Pedrin*, 797 F.3d 792, 794 (9th Cir. 2015) (affirming finding of no outrageous
18 government conduct where an "undercover agent pose[d] as a disgruntled drug courier
19 with knowledge about a stash house . . . containing a large amount of cocaine," suggested
20 "to targets of the reverse sting that they join forces, rob the house, and split the
21 proceeds," and then "arrested and charged [them] with conspiracy" once the targets took
22 "steps to rob the fictional house"); *Black*, 733 F.3d at 302 (affirming finding of no
23 outrageous government conduct in similar fictional stash-house sting operation planned
24 by government agent because, when "presented with the fictitious stash house robbery
25 proposal [the targets] . . . readily and actively" participated in the criminal activity "as
26 willing participants").  The standard is all the higher where, as here, law enforcement was
27 not responsible for creating the criminal scheme under investigation.
28

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 3

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

In *Black*, the Ninth Circuit articulated six factors that indicate whether the government's conduct was outrageous in a given criminal investigation:[1]

> (1) known criminal characteristics of the defendant[]; (2) individualized suspicion of the defendant[]; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendant[] to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue.

*Black*, 733 F.3d at 303. This is not a formalistic checklist, and assessing the government's conduct under these factors is not a bright line inquiry, but instead involves an evaluation of the totality of the circumstances based on the facts of each particular case. *Id.* at 302, 304. These factors weigh against dismissal in this case.

### III.   ARGUMENT

**A.   Known Criminal Characteristics of Website A Users/Individualized Suspicion of Michaud.**

The first two factors are "[c]losely related," and they examine whether, at the time the operation commenced, the government had reasons to suspect "an individual or identifiable group," and whether that individual or group had a "propensity the government knew about when it initiated its" investigation. *Black*, 733 F.3d at 304. When the government began administering Website A, it admittedly had no individualized reason to suspect Michaud of any crime. It did, however, have a very good reason to suspect that members of that website were involved with child pornography, and that those individuals had a propensity for such criminal behavior.

---

[1] Michaud's motion to dismiss neither cites these factors nor makes any effort to illustrate how they would support dismissal of the Indictment in this case.

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 4

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    As described in the affidavit supporting the use of a Network Investigative Technique ("NIT") in an effort to identify site users, between September 2014 and February 2015, undercover FBI agents connected to Website A via the Tor network and accessed the website in order to document its contents.  Dkt. 47, Ex. 1, p. 13, ¶ 11. Website A appeared to have been operating since August 2014.  *Id*.  It was a target of investigation precisely because its users were engaged in the unlawful advertising, distribution and access of child pornography.  The site's administrators and users regularly sent and received illegal child pornography via the website.  *Id*., p. 10, ¶ 6. Images and videos that were advertised, distributed and accessed through the site were highly categorized according to the gender and age of the victims portrayed–including so-called "jailbait," "pre-teen" and "toddlers"–as well as the type of sexual activity depicted, including hardcore ("HC") and softcore ("SC") child pornography.  *Id*., pp. 15-17, ¶¶ 14-18.  Images and videos on the site depicted, among various other acts of criminal child exploitation, "an adult male's penis partially penetrating the vagina of a prepubescent female," and "an adult male masturbating and ejaculating into the mouth of a nude, prepubescent female." *Id*., pp. 17-20, ¶¶ 18-25.  The most postings to the site were made within a sub-section for "Pre-teen" videos dubbed "Girls HC," where hardcore pornographic images of pre-teen girls were advertised, distributed and accessed.  *Id*., p. 16, ¶ 14.  The site included features such as image and file hosting and a chat forum, all of which allowed users to upload links to child pornography accessible to registered users of the site.  *Id*., p. 19-20, ¶¶ 23-25.  Specific examples of child pornography distributed through those site features were described in the NIT affidavit.  *Id*.  All of that documented activity consisted of activity engaged in by site users before law enforcement seized the website on February 20, 2015.

Based on this information, there was ample reason to suspect that users of Website A were engaged in criminal activity prior to the FBI seizure of the website.  The ensuing investigation then targeted those users, including a user named "Pewter" who turned out

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 5

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

to be Michaud.[2]  Dkt. 47, Exs. 1 and 5; Ex. 2, p. 20-22, ¶¶ 24-26.  Because this investigation was "focused on a category of persons [the government] had reason to believe were involved in the type of illegal conduct being investigated," the first two *Black* factors weigh against any finding of outrageous governmental conduct.  *Black*, 733 F.3d at 304 (citing *United States v. Garza–Juarez*, 992 F.2d 896, 899-900 (9th Cir. 1993)).

**B.     The Government Played No Role in Creating the Crime of Which Michaud is Accused.**

The third *Black* factor assesses the government's role in creating the crime at issue:  whether the government "proposed the criminal enterprise or merely attached itself to one that was already established and ongoing." *Black*, 733 F.3d at 305.  This factor plainly favors the government.  The government had no role in the creation of Website A; its criminal activity was ongoing at the time the government seized it in February 2015.  Nor did the government play a role in Michaud's attachment to that criminal enterprise, as he joined the website long before the government seized it.  Moreover, the government had nothing to do with the child pornography found on Michaud's computers and digital devices for which he stands charged.

The vast majority of the cases where "outrageous" government conduct may be at issue are those in which the government itself fabricated the criminal activity at issue and then invited defendants to come along.  That plainly did not happen here.  *See, e.g.*, *United States v. Mayer*, 503 F.3d 740, 754 (9th Cir. 2007) (noting that the defendant was

---

[2] "Pewter" registered an account on "Website A" on October 31, 2014 and spent 99 hours logged into the website between October 31, 2014, and March 2, 2015. Dkt. 47, Ex. 2, pp. 21-22, ¶¶ 25-26. Between February 20, 2015, and March 2, 2015, "Pewter" viewed 187 message threads on the website, including threads with titles such as "10yo teen with anal front with his father," "Alicia 10 yo little girl loves adult sex (cum in mouth)," "7yo APRIL hj bj finger pencil in ass vib cum," "Lauri ~8yo 3 videos, tasting cum," and "Girl 12ish eats other girls/dirty talk." *Id*., p. 22, ¶¶ 27-30. Child pornography "Pewter" accessed on March 2, 2015, contained links to an image that depicted a prepubescent female being anally penetrated by the erect penis of an adult male. *Id*., p. 23, ¶¶ 32-33. On February 28, 2015, "Pewter" accessed the post entitled "Girl 12ish eats other girls/dirty talk" in the section "Pre-teen Videos >> Girls HC." *Id*., p. 22, ¶ 30.

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 6

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

the first to broach the subject of traveling internationally to have sex with boys). Accordingly, the third factor weighs against dismissal as well.

### C. The Government Did Not Encourage Michaud to Participate in the Crimes at Issue.

The fourth *Black* factor assesses the extent to which the government encouraged the defendant to participate in the crimes at issue. *See Black*, 733 F.3d at 308. Michaud joined Website A on October 31, 2014, long before law enforcement seized it. Law enforcement had no contact with Michaud whatsoever during the period when it had administrative control of the website, or beforehand. Michaud chose to register and to access child pornography on the site of his own volition. Nor is there any indication that the government in any way encouraged him to commit the crimes of receiving or possessing child pornography, with which he was charged only after images of child pornography were found on digital devices he possessed. As such, the fourth factor in the analysis weighs against dismissal.

### D. The Nature of the Government's Participation in Website A Was Not Responsible for Michaud's Commission of the Charged Crimes.

The fifth *Black* factor assesses the government's participation in the offense conduct, meaning the duration, nature, and necessity of that participation. *See Black*, 733 F.3d at 308-09. Longer durations are more problematic. *See, e.g.*, *Greene*, 454 F.2d at 786 (finding outrageous government conduct where participation was of "extremely long duration," of between two and one half and three and one half years). In assessing the nature of the government's involvement, courts examine whether "the government acted as a partner in the criminal activity, or more as an observer of the defendant's criminal conduct." *Black*, 733 F.3d at 308. Finally, courts in the Ninth Circuit examine the "*necessity* of the government's participation in the criminal enterprise," which refers to "whether the defendant[] would have had the technical expertise or resources necessary to commit such a crime without the government's intervention." *Id.* at 309 (emphasis in original). All of these weigh in the government's favor.

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 7

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    Website A operated under the control of its administrator from approximately
2 August 2014 until February 20, 2015, a period of six months. By contrast, the FBI
3 briefly assumed administrative control of the website–in order to take court-authorized
4 steps to identify its users–for approximately two weeks, from February 20, 2015, until
5 March 4, 2015, before shutting the website down. That is far shorter than the years-long
6 duration the Ninth Circuit has found to be problematic. *See, e.g.*, *Greene*, 454 F.2d at
7 786.
8    During the brief period when FBI assumed administrative control of the site, the
9 FBI did not post any images, videos, or links to images or videos of child pornography.
10 Any posting of child pornography images, videos, or links to images or videos was done
11 by users of the website, not by the FBI. The FBI also did not engage directly with
12 Michaud, or his alias "Pewter," at all during the course of the operation. Accordingly,
13 with respect to child pornography, or links thereto, that was posted to or accessed via
14 Website A by its users during the brief period in which FBI assumed administrative
15 control over the site, the FBI's role was as an observer, collecting court-authorized
16 information in order to attempt to identify and apprehend users like Michaud who were
17 engaging in criminal activity.
18    Michaud was already a registered user of Website A as of October 2014, months
19 before the FBI seized the site. He also possessed child pornography on digital devices,
20 which the FBI located following court-authorized searches of his residence and
21 associated devices. Child pornography on electronic devices that was not acquired from
22 Website A has nothing to do with the government's brief operation of Website A. The
23 FBI did not interact with Michaud at all before his interview and arrest, much less
24 provide him with the knowledge to access Tor and find Website A, encourage him to
25 register or access child pornography on it, or provide him with computers and digital
26 devices on which to download and store child pornography. Accordingly, Michaud
27 clearly "had the technical expertise or resources necessary to commit [the charged
28

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 8

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  crimes] without the government's intervention." *Black*, 733 F.3d at 308, and thus the fifth
2  factor weighs against dismissal.

### E. The Investigative Technique Used Was Necessary in Light of Michaud's Use of Tor to Conceal His Identity and Location.

The sixth *Black* factor assesses the "need for the investigative technique that was used in light of the challenges of investigating and prosecuting the type of crime being investigated." *Black*, 733 F.3d at 309. *Cf., e.g.*, *United States v. Emmert*, 829 F.2d 805, 812 (9th Cir. 1987) (holding $200,000 finder's fee inducement not outrageous because "large sums of money are common to narcotics enterprises and necessary to create a credible cover for undercover agents"); *United States v. Wiley*, 794 F.2d 514, 515 (9th Cir. 1986) (approving of the government's activation of a prison smuggling scheme given the "difficulties of penetrating contraband networks in prisons"); *see also Twigg*, 588 F.2d at 378 n.6 ("[I]n evaluating whether government conduct is outrageous, the court must consider the nature of the crime and the tools available to law enforcement agencies to combat it."). This factor weighs heavily in favor of the government's conduct here.

As the government explained to the two separate judges who authorized the NIT and the Title III authorization to monitor site users' communications, the brief continued operation of Website A in order to deploy the court-authorized NIT was necessary given the use of Tor by Michaud and other users to conceal their identity and location. Without using the NIT, the identities of the administrators and users of Website A would remain unknown because, unlike on a non-Tor website, any IP address logs of user activity on Website A would pertain only to Tor "exit nodes," which could not be used to locate and identify the administrators and users. Further, because of the unique nature of the Tor network and the method by which the network routes communications through multiple other computers, other investigative procedures that are usually employed in criminal investigations of this type were tried and failed or reasonably appeared to be unlikely to succeed. Dkt. 47, Ex. 1, pp. 22-24, ¶¶ 29-32; *id.*, Ex. 5, p. 26, ¶ 39, pp. 30-31, ¶¶ 52-53.

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 9

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

The government demonstrated the necessity of the investigative strategy and technique used in this investigation in the affidavit submitted in conjunction with its Title III authorization. Dkt. 47, Ex. 5, pp. 38-43, ¶¶ 62-75. As the government indicated in that affidavit, agents considered seizing Website A and removing it from existence immediately and permanently. Dkt. 47, Ex. 5, p. 41, ¶ 72. In the judgment of law enforcement agents, while doing so would have ended the trafficking of child pornography taking place via Website A, it would have also prevented law enforcement from attempting to locate and identify its users, who were the ones who possessed, and were distributing and receiving, those illicit materials. *Id*. It also would have frustrated agents' attempts to obtain information that could help identify and rescue child victims from ongoing abuse. *Id*. Accordingly, it was the judgment of law enforcement that the seizure and continued operation of Website A, for a limited period of time, paired with the deployment of a NIT and monitoring of user communications, was necessary and appropriate in order to identify Website A users. *Id*. The judge who signed the Title III warrant obviously agreed.

To be sure, shutting down a facility such as Website A prevents its unidentified users from continuing to post and disseminate child pornography *through that website*, but it does not prevent those users from continuing to unlawfully possess and disseminate child pornography by other means. Website A users engaged in that sort of activity before FBI seized and shut down Website A, and those users who have not been identified and apprehended undoubtedly continued to engage in that activity after Website A was shut down. Stopping the unlawful possession and dissemination of child pornography materials, and rescuing children from the ongoing abuse and exploitation of perpetrators, requires more than just shutting down a facility through which such materials are disseminated. Law enforcement must identify and apprehend the perpetrators. Here, the FBI briefly assumed administrative control over an existing facility through which users were already posting and accessing child pornography for a limited period of time in order to deploy a court-authorized investigative technique and

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 10

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

engage in court-authorized monitoring of user communications, which were necessitated by the particular anonymizing technology deployed by the users of the site, all in an effort to identify those perpetrators. Undoubtedly, the decision whether to simply shut down a website like Website A or to allow it to continue operating is a difficult one for law enforcement, given that users would continue to be able to post and access child pornography. Here, that difficult decision, which was disclosed both to the magistrate who approved the NIT and the district judge who approved the Title III monitoring, was amply justified by the particular facts of the investigation. Accordingly, the "investigative technique that was used" in this case was necessary given the "challenges of investigating and prosecuting the type of crime being investigated," *Black*, 733 F.2d at 309, and the final factor weighs against dismissal of the case.

### III.  CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion to dismiss the indictment.

DATED this 21st day of December, 2015.

Respectfully submitted,

| | |
|---|---|
| ANNETTE L. HAYES<br>United States Attorney | STEVEN J. GROCKI<br>Chief |
| */s/ Matthew P. Hampton*<br>Matthew P. Hampton<br>Andre M. Penalver<br>Assistant United States Attorney<br>1201 Pacific Avenue, Suite 700<br>Tacoma, Washington 98402<br>Telephone: (253) 428-3800<br>Fax:           (253) 428-3826<br>E-mail:     matthew.hampton@usdoj.gov<br>                 andre.penalver@usdoj.gov | */s/ Keith A. Becker*<br>Trial Attorney<br>Child Exploitation and Obscenity Section<br>1400 New York Ave., NW, Sixth Floor<br>Washington, DC 20530<br>Phone: (202) 305-4104<br>Fax: (202) 514-1793<br>E-mail: keith.becker@usdoj.gov |

UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS INDICTMENT (*United States v. Michaud*, CR15-5351 RJB) - 11

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

**CERTIFICATE OF SERVICE**

I hereby certify that on December 21, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the attorney of record for the defendant.

          */s/ Matthew P. Hampton*
          MATTHEW P. HAMPTON
          Assistant United States Attorney